IN THE UNITED STATES DISTRICT COURT
FOR THE CENTRAL DISTRICT OF ILLINOIS
SPRINGFIELD DIVISION

OZIE C. CARTER,                              )
                                             )
     Plaintiff,                     )
                                             )
     v.                             )          NO. 12-3349
                                             )
CAROLYN COLVIN,                              )
COMMISSIONER OF SOCIAL                       )
SECURITY,                                    )
                                             )
     Defendant.                     )

OPINION

RICHARD MILLS, U.S. District Judge:

This is an action for judicial review of the final decision of the

Commissioner of Social Security, finding that Plaintiff Ozie Carter was not

entitled to Disability Insurance Benefits (DIB) and Supplemental Security

Income (SSI) under Titles II and XVI of the Social Security Act, 42 U.S.C.

§§ 416(i), 423(d) and 1382c.

Pending before the Court is the Commissioner's Motion for Summary

Affirmance.  Pending also is the Plaintiff's Motion for Summary Judgment.

For the reasons that follow, the Court finds that the administrative

decision is not supported by substantial evidence.

# I. INTRODUCTION

The Plaintiff applied for DIB and SSI in July of 2009, alleging that she became disabled on June 4, 2009, due to degenerative joint disease, back pain, obesity, diabetes and depression. The Plaintiff's applications were denied initially and upon reconsideration. A hearing was held before an administrative law judge (ALJ) on September 1, 2011, during which the Plaintiff testified. A vocational expert, Dennis Gustafson, also testified.

On October 12, 2011, the ALJ found that Plaintiff was not disabled because she could perform a significant number of jobs in the national economy. The Appeals Council denied the Plaintiff's request for review. Pursuant to 42 U.S.C. §§ 405(g) and 1383(c)(3), the Plaintiff seeks judicial review of the ALJ's decision.

# II. STATEMENT OF FACTS

## A. Background Facts

The Plaintiff was born in October of 1957 and was 51 years old at the time of her alleged onset date. Her highest level of formal education was

the 9th grade.  The Plaintiff worked jobs as a school bus driver, as a steamer at a uniform cleaning company and as a cashier.  She stated on a Social Security application on July 28, 2009 that she became "unable to work" on June 4, 2009, and that she remained "disabled."  On a separate form, she stated that "degenerative joint disease, diabetes, obesity, lower back pain and depression" were the conditions that "limit" her ability to work because she was not able to stand for long periods, her legs and arms went numb, she had constant pain in her neck and hands, and the effects of a remote car accident eroded her mobility and mobile skills.

B. Medical evidence

The ALJ's decision makes credibility findings, assessments of medical opinions, findings and conclusions based on extensive citations to the record.

In September of 2008, the Plaintiff (who still worked at the time) saw her doctor at a community health clinic.  He noted she was morbidly obese.  Her affect was "exaggerated" and this was accompanied by flight of ideas and emotional liability during the examination.   The Plaintiff had

tenderness and lost motion to a mild degree in her neck, and she had positive clinical signs of carpal tunnel syndrome upon examination. Her diabetic glucose levels and hemoglobin A1C were well controlled. She was diagnosed with both brachial neuritis and carpal tunnel syndrome. The doctor stated she needed to be evaluated with Beck Depression Inventory. The Plaintiff was sent to a therapist who agreed she had depression. She denied that depression itself was a problem, telling the therapist that treatment for depression would not help her pain and lack of finances. The Plaintiff "appeared depressed" according to the doctor who examined her neck and hands, and was diagnosed with depression as well.

On September 24, 2008, simple x-rays indicated moderate degenerative changes at multiple levels of her cervical spine. The Plaintiff had stopped testing her diabetes. Her A1C level rose to 13. Although the Plaintiff requested an MRI for her neck, she was told she had to wait for a pain specialist referral. However, she could not afford the services of a pain specialist. Because she was unable to see a pain specialist, the Plaintiff could not obtain a refill of her pain medication.

In February of 2009, the Plaintiff did see a pain specialist. Goran Tubic, M.D., reviewed an MRI which he said showed foraminal nerve encroachment in the cervical spine. Dr. Tubic stated she needed an epidural steroid injection for her neck pain. Because the Plaintiff had no insurance, was self-pay and could not afford this treatment, Dr. Tubic placed her on four different pain medications, including Neurontin, Cymbalta, Voltaren and Norco. Dr. Tubic noted that she had severe pain from trying to work as a bus driver. After taking the medications for a month, the Plaintiff found that when she took all four, she felt better. However, she could not afford all four medications. In May, she had to stop driving and was then trying to work as a monitor only. According to the radiologist, the MRI showed that Plaintiff had moderate compression and flattening of the spinal cord at C4/5. The moderate neuroforaminal narrowing noted by the doctor was at C5/6. At C6/6, the Plaintiff was again found to have moderate spinal stenosis. The pain specialist, Dr. Tubic, agreed that Plaintiff had cervical radiculopathy.

When she followed up with her primary doctor in April of 2009, the

Plaintiff had diminished sensation in her lower extremities and had a 50-pound weight gain and now weighed 270 pounds. The Plaintiff complained her legs felt heavy and she had neck pain, pain in her arms and hands, and tingling of her arms. She attributed the disc changes in her cervical vertebrae to an auto accident. The Plaintiff was seeing an acupuncturist nurse who noted a number of problems. Her diabetes control was acceptable. The Plaintiff reported that driving to her appointment had exacerbated her problems and she complained about her financial and medical problems. In May of 2009, the acupuncturist observed edema in her feet and her hands.

Although the Plaintiff was still trying to work on June 1, 2009, she stopped working three days later because it involved too much traveling and pain in her arms and hands from driving. The Plaintiff believed her employer treated her unfairly. She continued to see the nurse practitioner and get acupuncture in order to provide relief from her bodyache and hand and arm discomfort. She felt that doing laundry and housework had aggravated her pain.

The Plaintiff states that some of her medical records are not included as part of the record. On November 24, 2008, there is an indication that prescribed wrist splits were of no help for her symptoms of pain and numbness in all ten fingers. The Plaintiff had been sewing in the fall of 2008, which resulted in pain in her hands which awakened her at night.

The Plaintiff was sent to Joseph J. Kozma, M.D., for a consultative physical examination on January 12, 2010. Dr. Kozma found her to be "screaming and acting aggressively" and it was hard to interview her because she was off topic "about personal conflicts with little relationship to physical performance. She was agitated throughout the entire examination." The Plaintiff was cooperative but "very emotional." Her grip strength was determined to be low average at 3/5 bilaterally. Dr. Kozma commented on her mental status as follows:

> She has a very unstable emotional state. She appears to be functioning well intellectually but she is extremely emotional showing characteristics of emotionally unstable personality. She has outbursts of extreme emotions. While she obviously thinks that her emotional outbursts will help her cause with her disability it is clear that the behavior is ineffective if it is applied to her physical characteristics.

Although Dr. Kozma did not reference any other medical records he was sent to review, he was aware that Plaintiff was taking medications, including neurontin, cymbalta, amitriptyline, and flexeril. He noted there was no reliable information on her obesity. Dr. Kozma assumed she had hypertension, based on the medication she was taking. He diagnosed morbid obesity with a body mass index of 52 and stated she had difficulty moving as a result. Dr. Kozma also diagnosed reactive depression and a sociopathic personality.

In February of 2010, the Plaintiff was evaluated by Diana Widicus, M.D. Dr. Widicus opined that she had a diminished IQ and her diabetes was poorly controlled. Her A1C level was 13. According to Dr. Widicus, because of the Plaintiff's short attention span, she would have difficulties with even simple, sedentary one or two-step job duties. Dr. Widicus stated that Plaintiff had cervical and lumbar radiculopathy with nerve encroachment, and severe varicosities in her legs that made it difficult for her to stand and walk. Following an examination on June 17, 2010, she wrote the Plaintiff a prescription for a motorized scooter.

On March 12, 2010, the Plaintiff visited Fred Stelling MA, LCP for a consultative psychological examination. Dr. Stelling observed concerns with immediate memory/attention, short term memory and concentration. He noted that immediate/short term memory issues can be related to depression. Dr. Stelling did not find the Plaintiff to be malingering and assessed a Global Assessment of Functioning (GAF) score of 50-51.[1] He found that her depression and pain were connected and issued a guarded prognosis.

On March 26, 2010, the Plaintiff's file was reviewed by psychologist Russell Taylor, Ph.D., who found she exhibited signs of Affective Disorder and sleep disturbance, decreased energy and difficulty concentrating and

---

[1]The GAF Scale is a 100-point metric used to rate overall pyschological, social, and occupational functioning on a hypothetical continuum of mental-health illness. See Am. Psychiatric Ass'n, Diagnostic & Statistical Manual of Mental Disorders 32, 34 (4th ed. text revision 2000). A GAF score of 41 to 50 corresponds with "serious symptoms (e.g., suicidal ideation, severe obsessional rituals, frequent shoplifting) or any serious impairment in social, occupational, or school functioning (e.g., no friends, unable to keep a job, cannot work)." Id. at 34. A GAF score of 51 to 60 corresponds with "moderate symptoms (e.g., flat affect and circumlocutory speech, occasional panic attacks) or moderate difficulty in social, occupational, or school functioning (e.g., few friends, conflicts with peers or co-workers)."

thinking.  Dr. Taylor opined the Plaintiff had moderate limitations on her daily activities, social functioning and her concentration.  He observed serious credibility concerns because Dr. Kozma had found that Plaintiff's only impairment was obesity.  Dr. Taylor opined that Plaintiff's degree of impairment alleged was not supported.  Her impairments would not preclude the capacity to engage in work related activity.

On June 9, 2010, the Plaintiff was seen by Claude Fortin, M.D., a neurologist.  He assumed that her diabetes was poorly controlled and observed that Plaintiff needed to lose weight.  Dr. Fortin encouraged her to get a primary care physician.

In July of 2010, Matthew Bilinsky, M.D., a state agency physician, reviewed the claim and noted Dr. Widicus's opinion.  The Plaintiff claims he noted only the negative findings and did not address the positive findings or diagnoses and conclusions of Dr. Fortin.  Dr. Bilinsky observed Dr. Kozma found nothing wrong with the Plaintiff except for obesity.  He gave Dr. Widicus's medical source statement "partial" but not "controlling" weight and found the Plaintiff to be "partially" credible.

In July of 2010, the Plaintiff filled out a form wherein she noted a number of medical problems. These included chronic pain in her hands, the deterioration of her spine and difficulty standing and walking. She visited a primary care doctor, Ronald Johnson, M.D., who observed that she had seen Dr. Widicus several months earlier but because she did not have insurance previously, the Plaintiff had questionable compliance with therapy. Dr. Johnson noted a limited IQ.[2] He observed she had a number of problems though her medical records were not available. Dr. Johnson observed clinical varicosities and diminished pulses in her feet and diminished range of motion of neck and spine. He concluded she had C5/6 stenosis and L4/5 disk disease. Dr. Johnson also diagnosed diabetic neuropathy and morbid obesity. Her A1C test was within range at 6.9. In September of 2010, Dr. Johnson observed that Plaintiff was "Weeping and wailing" about her weight. He explained she needed to go on a diet and get her weight under control before starting an exercise program. Dr. Johnson

---

[2]There do not appear to be any IQ scores in the record. The Plaintiff contends the ALJ should have ordered IQ testing. The Defendant notes that Plaintiff attended regular classes in school, passed the exam for a school bus driver's license and drove a school bus for five years.

stated she was probably not emotionally stable enough for weight loss surgery.  He suggested the Plaintiff get in-home care but she refused.  Her A1C had risen to 7.9.

By May of 2011, Dr. Johnson believed the Plaintiff needed psychiatric intervention, a neurological referral and an occupational therapy evaluation for a wheelchair.  The Plaintiff's weight had increased to 300 pounds and she sat rocking and crying "Jesus . . . 300," while appearing uncomfortable.  Dr. Johnson observed her to be mentally unstable and needed to see a psychiatrist.

On May 3, 2011, the Plaintiff was seen by the certified physician's assistant.  She was noted to have 2+ edema in her legs.  Her responses were slow, her speech was slurred and she appeared sleepy, but Dr. Johnson's nursing staff told the certified physician's assistant this was normal for her.

In October of 2010, Dr. Fortin noted severe clinical signs including positive Tinel's and Phalen signs.  He performed objective EMG tests proving "severe" bilateral median neuropathy and referred her for surgery.  In November 2010, she again saw Dr. Fortin, who noted Dr. Green had

since performed bilateral hand surgery which helped. In May of 2011, Dr. Fortin noted she was on 19 different medications. He noted depression and complaints of disabling pain. Dr. Fortin found she was morbidly obese, had a flat affect and she had a "labored" gait. Two months later, Dr. Fortin observed her gait to be tenuous and small-stepped. Dr. Fortin was willing to fill out forms for a scooter for her.

The Plaintiff had an objective MRI of her spine performed in December of 2009, which showed an encroachment of the neural foramen from a bulged disc at L4/5.

The Plaintiff was also referred for mental health treatment. In June of 2011, at the Mental Health Centers of Central Illinois, the Plaintiff was found to have significant deficits in functioning and was diagnosed with major depressive disorder, severe, with a GAF score of 47. During her assessment, the Plaintiff was tearful, irritable and behaved inappropriately.

In July of 2011, the therapy notes for the Plaintiff provide that she has lost 23 pounds and feels good about herself. She was making better food choices. Although the Plaintiff had not been exercising regularly, she

had gone fishing several times and was sexually active. She described having sex as "exercise." The Plaintiff also stated that she had difficulty walking and was in pain and not able to work. She stated that the therapy had been helpful.

Emergency room records from July of 2011 indicate that the physician there observed muscle spasms in her back. She was administered injections or toradol and nubain.

C. Hearing testimony

The Plaintiff testified she had completed the ninth grade but was unable to obtain her GED. In order to obtain her school bus license, the Plaintiff studied for months and still failed. She then had a sample text to study and eventually passed.

The Plaintiff testified her most significant problem was her legs and difficulty standing. She weighed 257 pounds after having lost 43 pounds in three months. The Plaintiff testified she felt better but needed to lose more weight because she still could not get around or do things very well. The Plaintiff was taking medicine for migraines, though it only relieved

some of the pain.  The medicine also resulted in side effects such as itching.  She also had neck and back pain.

The ALJ alluded to the statement made by the Plaintiff to her mental health provider regarding engaging in sex for exercise.  The Plaintiff stated that this depended on whether she was feeling well.  She did not have sex if she did not feel well.  The ALJ suggested the Plaintiff's testimony was somewhat inconsistent, given the extent of the activity required.  The Plaintiff responded that having sex sometimes caused pain or migraines.  The Plaintiff had to go to the hospital to get medication to relax a muscle because she was "foolish and had sex."

In describing her depression, the Plaintiff was crying during her testimony.  She withdrew and did not want to interact with others at her high rise apartment.  The Plaintiff also had difficulty sleeping and did not realize she was taking medicine for that problem.  One reason she was depressed was because she had difficulty supporting herself and could not afford the basic necessities for personal care.

The Plaintiff described a typical day as stressful because she was

usually trying to get a number of things done. She spent the previous day watching television in the morning and then getting her laundry together and going to the Laundromat. She was at the Laundromat for approximately three hours before returning home and relaxing for a couple of hours in the air conditioning while watching television. She then took a nap in the late afternoon. The Plaintiff prepared dinner and ate at around 9:00 p.m. She testified that she watched television until 1:00 a.m. and went to bed.

The Plaintiff testified that she drove about four times per month. She typically drove to get groceries or pick up her medicine. The previous month, the Plaintiff had driven about three hours to Joliet, Illinois where she spent a week with her daughter. In Joliet, she attended her grandson's t-ball games. She sat on the porch with her grandchildren and played a dice game.

The Plaintiff testified she separated from her husband about two years earlier and she had a boyfriend. They dated in the 1980s and reconnected in recent years. She testified she slept with him "once in a while." The

Plaintiff takes him fishing a couple of times a month. She enjoys crocheting when she can afford the yarn. The Plaintiff testified she vacuumed every couple of weeks and had recently cleaned the bathroom.

The Plaintiff testified that she received poor grades in school. She also stated that she occasionally has swelling of her legs after standing, at which time she has to elevate her legs. The Plaintiff typically used a scooter when shopping at the grocery store. Store employees loaded the groceries in her car and the Plaintiff used a provided cart to move them from the car to her apartment. The Plaintiff thought she could pace the length of the hearing room about four times before needing a rest. At the time of the hearing, the Plaintiff had a cane and said she needed a scooter. She thought she could stand for about five minutes before needing to sit down.

The Plaintiff testified that she had trouble with her bowels and also had difficulty wiping herself. She would have to get in the shower in order to clean herself which made the Plaintiff more depressed.

The Plaintiff stated she took medicine every day for headaches. She explained that she took it every day instead of only when she had a

headache because the medicine helped "balance the pain" so it didn't occur as often. The Plaintiff believed her neck problems caused the migraines.

The Plaintiff testified she had worked in a uniform factory at one point. She stated she was let go because should was unable to input data in the computer system fast enough.

The Plaintiff testified she had trouble with her hands and had recently had surgery on both wrists.

### D. Vocational expert's testimony

The vocational expert testified the Plaintiff had no transferable skills to sedentary work. If she was limited to unskilled work, then she could not perform any of her past work. The ALJ questioned the vocational expert about certain restrictions for light work and identified a number of jobs that could be done. The Plaintiff notes the vocational expert testified that all of these jobs required at least six hours out of an eight-hour day of reaching, handling and fingering "at the high end" of "frequent" or the "full level" of frequent. Anything less and the jobs probably could not be performed. All of the jobs required a "consistent pace."

The vocational expert was asked "if the individual is unable to attend work within a schedule and they miss either entire shifts or portions exceeding an hour or two of a shift and that occurs more than twice a month, would they be able to sustain those jobs?" The vocational expert responded that they would not be able to perform the jobs as described.

E. ALJ's decision

The ALJ found that the Plaintiff had not engaged in substantial gainful activity since June 4, 2009, her alleged onset date. The ALJ found that Plaintiff had the following "severe" impairments: degenerative disc disease, status post carpal tunnel surgeries, diabetes with neuropathy, varicose veins, headaches, obesity and depression. Although the impairments were determined to cause significant limitations in the claimant's ability to perform basic work activities, the ALJ found that they did not meet or medically equal an impairment set forth in the Listing of Impairments.

The ALJ assessed a residual functional capacity for "light" work, except that the work must not involve ladders, ropes or scaffolds and she

could only occasionally climb ramps/stairs and occasionally balance, stoop, kneel, crouch, and crawl. The ALJ further stated the Plaintiff should not have any exposure to hazards such as dangerous machinery and unprotected heights. The Plaintiff could use her upper extremities frequently, but not constantly, for work activities and was limited to unskilled work. Moreover, she was limited to no more than occasional work interaction with co-workers, supervisors and the general public.

In considering these limitations, the ALJ found that Plaintiff was precluded from performing any past relevant work. However, based on the Plaintiff's age, education, work experience and residual functional capacity, the ALJ found that there were a significant number of jobs in the national economy that she could perform.

The ALJ did not find the Plaintiff's allegations of complete and total disability to be "fully credible." She believed there were inconsistencies between the Plaintiff's activities and what she had told doctors. Additionally, the ALJ discounted the results of the Plaintiff's MRI in December of 2009 because it required "clinical correlation." The Plaintiff

had an "intact gait" and had recently cleaned her vacation home and accompanied her then-husband on "gigs."

The ALJ also rejected the opinion of Dr. Widicus, the Plaintiff's primary care physician, finding it to be conclusory and inconsistent with some of the other evidence. She found Dr. Widicus had relied heavily on the subjective statements of the claimant. Moreover, the ALJ also thought Dr. Widicus may not have known what "disability" meant under the Act and might have thought it meant only disabled from past work. The ALJ further noted that some patients can be somewhat "insistent and demanding" and it is thus possible the doctor was sympathetic with the Plaintiff and wanted to satisfy her requests and avoid any tension. The ALJ stated that she did not find Dr. Widicus's opinion to be persuasive and thus did not assign it controlling weight.

The ALJ found that the low GAF scores attributed to the Plaintiff were not consistent with the objective record. Because a GAF score reflects an assessment of a claimant's functioning at a specific time, the ALJ stated it provided no indication of the Plaintiff's level of functioning over an

extended period.  The ALJ did not address the GAF score as found by Dr. Stelling in early 2010.  The Plaintiff claims that the ALJ also did not address Dr. Stelling's findings that favored her claim.

## III. DISCUSSION

### A. Standard of review

The ALJ's decision must be upheld if it is supported by substantial evidence.  See Moore v. Colvin, 743 F.3d 1118, 1120 (7th Cir. 2014).  "Substantial evidence" includes "such relevant evidence as a reasonable mind accepts as adequate to support a conclusion."  Id. (citations omitted).  The ALJ's decision must include a "logical bridge from the evidence to the conclusions sufficient to allow . . . a reviewing court[] to assess the validity of the agency's ultimate findings and afford [the Plaintiff] meaningful judicial review."  Id.

### B. ALJ's reasoning and alleged errors

#### (1)

The Plaintiff contends the ALJ made a number erroneous credibility findings.  She further claims these errors violate the regulatory standards for

credibility assessment.

The Plaintiff criticizes the ALJ's finding that "she lost 43 pounds by having sex," suggesting that the statement mischaracterizes evidence and almost takes advantage of a woman who is "cognitively, educationally and emotionally limited."  The full paragraph reads:

> Despite all of the claimant's subjective complaints of pain and inability to move, lift, push, pull, and tug, she lost 43 pounds by having sex, in addition to her other noted activities of cleaning, shopping and driving.

While the phrasing certainly could have been better, it appears the ALJ was attempting to say that the Plaintiff was capable of engaging in certain activities, one of which was sex, which required the ability to move. The implication is that despite her subjective reports, the Plaintiff is not completely unable "to move, lift, push, pull and tug."  Moreover, the ALJ specifically notes that Plaintiff's consumption of only one meal in the evening helped her to lose weight.  Accordingly, the Court does not agree that this is an unsupported finding or mischaracterization of evidence.

The Plaintiff also criticizes the ALJ for translating a casual statement to the Plaintiff's therapist–that she "walked everywhere when her car did

not work"–into a literal truth.  The ALJ thus concluded that Plaintiff was not credible when she said she had difficulty walking.  Although there is evidence that Plaintiff had some difficulty walking, the record establishes that she engaged in activities that required walking.  Accordingly, the statement the Plaintiff "walked everywhere" is a mischaracterization to the extent that it is taken literally.

The ALJ found that Plaintiff engaged in a number of activities that required walking.  These included vacuuming, cleaning her vacation home, cleaning her landlord's apartment, taking the groceries from her car to her upstairs apartment, and going fishing.  The Plaintiff notes that the record establishes that she was complaining bitterly about the pain that resulted from some of these activities and the difficulty she had engaging in these tasks.  Pursuant to the applicable regulations and social security rulings, these daily activities are factors that should be considered in evaluating a claimant's pain complaints and determining whether she can engage in any work-related activities despite any pain.  The ALJ's findings that Plaintiff exaggerated at times and her daily activities were inconsistent with

disabling pain have some support in the record.

The Plaintiff asserts the ALJ did not provide specific reasons regarding the weight given to the Plaintiff's statements, as is required under SSR 96-7p. See Zurawski v. Halter, 245 F.3d 881, 887 (7th Cir. 2001). She contends the ALJ ignores the records and evidence that most of the activities the Plaintiff engaged in caused her pain. The Plaintiff further alleges that her ability to engage in certain activities (despite any pain that resulted) is not inconsistent with objective findings such as the MRI study of her neck which showed spinal stenosis, EMG tests showing objectively severe neuropathy and psychological tests showing deficiencies in memory, concentration, persistence and pace. In October of 2010, the Plaintiff was determined to have severe carpal tunnel syndrome.

The Plaintiff claims the ALJ did not address the relative consistency of some of her complaints, particularly regarding her difficulty standing, walking and moving around. Additionally, the ALJ did not consider the Plaintiff's mental impairments in determining the extent of pain and other symptoms and how credibility might be affected. The Plaintiff further

contends that the ALJ erroneously rejects the findings of Dr. Widicus as "minimal" and inconsistent with the Plaintiff's daily activities and objective evidence.

The ALJ noted that following the Plaintiff's carpal tunnel surgery, her hands no longer hurt as of November of 2010 according to Dr. Fortin's report. The ALJ also observed that at an appointment in May of 2011 (with Dr. Johnson), the Plaintiff's gait was found to be normal and she had no tenderness in her neck, thoracic spine, shoulder joints, elbow joints, wrist joints, hip joints, knee joints or ankle joints. Tenderness was found only in the lumbar spine.

The ALJ further observed that the Plaintiff's subjective complaints prior to surgery regarding her hand pain were not consistent with the objective medical findings, as determined by Dr. Kozma and Dr. Johnson. The ALJ noted that Plaintiff was known to "exaggerate." Although the Plaintiff makes much of the ALJ's finding that Plaintiff's statement she was "dying" of pain is an example of her exaggeration, the ALJ relied on objective evidence as well. This includes Dr. Kozma's observations and

findings, the Plaintiff's giveaway weakness as found by Dr. Fortin and her request for a scooter. The ALJ further relied on the Plaintiff's statements about her ability (or lack thereof) to perform everyday activities and contrasted that to what she actually did.

The Plaintiff alleges that her statements which the ALJ classified as "exaggerations" were made because of her low IQ. While that it a plausible reason, it also possible such statements were made because the Plaintiff thought they would help her obtain benefits.

The most recent records submitted by the Plaintiff indicated Dr. Fortin found that her back pain was "non-radiating." In his 2011 report, Dr. Fortin diagnosed idiopathic neuropathy with acroparesthesia (i.e. pain in the digits), in addition to low back pain. Dr. Fortin considered an epidural injection. Dr. Fortin in 2010 and Dr. Johnson in 2011 both stated that Plaintiff's neuropathy was caused by diabetes. Dr. Fortin noted the Plaintiff had trouble with her gait, in part due to her obesity.

The Defendant notes that to the extent that the ALJ did not discuss Dr. Fortin's or Dr. Johnson's findings as to depression, Dr. Fortin observed

that Plaintiff's "past medical history" included depression. However, his subsequent reports and notes do not indicate that Plaintiff is depressed or being treated for depression.

Dr. Johnson saw the Plaintiff beginning in August of 2010. He noted that Plaintiff had a family history of depression (in addition to a number of other ailments). However, he found that Plaintiff's memory function was normal and she had unimpaired insight and judgment. Dr. Johnson observed that Plaintiff cried and/or appeared depressed in October of 2010 and May of 2011–about her weight and/or her difficulty getting around. In October of 2010, Dr. Johnson did not believe she was "emotionally unstable enough to do wt. loss surgery." In May of 2011, Dr. Johnson found the Plaintiff to be mentally unstable and stated she should see a mental health professional.

(2)

The ALJ eventually determined, "After careful consideration of the evidence, the undersigned finds that the claimant's medically determinable impairments could reasonably be expected to cause the alleged symptoms;

28

however, the claimant's statements concerning the intensity, persistence and limiting effects of these symptoms are not credible to the extent they are inconsistent with the above residual functional capacity assessment."

The United States Court of Appeals for the Seventh Circuit has "repeatedly condemned the use of that boilerplate language because it fails to link the conclusory statements made with objective evidence in the record." Moore, 743 F.3d at 1122 (citing Pepper v. Colvin, 712 F.3d 351, 367 (7th Cir. 2013); Bjornson v. Astrue, 671 F.3d 640, 644-45 (7th Cir. 2012); Filus v. Astrue, 694 F.3d 863, 868 (7th Cir. 2012); Shauger v. Astrue, 675 F.3d 690, 696 (7th Cir. 2012)). The court observed that the statement does not explain the basis for the residual functional capacity determination. See id. It "puts the cart before the horse, in the sense that the determination of capacity must be based on the evidence, including the claimant's testimony, rather than forcing the testimony into a foregone conclusion." Id. (quoting Filus, 694 F.3d at 868). The court in Moore noted, however, that if the credibility determination is otherwise supported with information in the record, the use of the boilerplate language will not

automatically discredit the ALJ's conclusion.    See id.

In this case, the ALJ provided examples of what she believes are credibility issues with the Plaintiff's statements regarding many of her symptoms. The ALJ found that Plaintiff's statement that she had stopped driving the school bus because she could not control her hands was inconsistent with some of the medical evidence and her daily activities, such as that she enjoyed crocheting when she could afford to buy  yarn.

The Plaintiff did not take narcotic pain medication.  She did not take insulin for her diabetes.  The Plaintiff did not always consistently check her blood sugar levels or follow a proper diet.

The ALJ found the Plaintiff's statements about her headaches to be somewhat inconsistent.  Moreover, the ALJ observed that her doctor had prescribed medication for ongoing use.  No medication was prescribed to take when the headache starts in order for pain relief or to lessen the duration or frequency of the headaches.

The ALJ further noted that although a lumbar spine from December of 2009 showed bulging, it did not show herniation or stenosis.  Moreover,

the ALJ stated that her activities seemed to be inconsistent with disabling back pain.

The ALJ believed that Plaintiff exaggerated some of her symptoms. In June of 2010, Dr. Fortin noted motor strength of 5/5 in her upper and lower extremities, though she had "giveaway weakness." "Giveaway weakness" involves a patient giving poor effort on strength testing–perhaps in order to exaggerate the effects of pain so as to be found disabled. See Simila v. Astrue, 573 F.3d 503, 508 (7th Cir. 2009) (citations omitted). Following an examination in January of 2010, Dr. Kozma observed that Plaintiff had characteristics of an "emotionally unstable personality" and had "outbursts of extreme emotions." Dr. Kozma believed the Plaintiff thought these outbursts would help her obtain disability.

The ALJ noted the Plaintiff testified she was told that she did not need a scooter because she was able to walk in to the building for the assessment. Some of the examinations revealed that Plaintiff had a normal gait. The ALJ observed that Plaintiff used a cane at the hearing that she had obtained on her own. The Plaintiff testified that although she needed

help to load from store employees to load groceries in to her car, she unloaded the groceries at home and took them up to her apartment.

The ALJ found that there was a disparity between the activities the Plaintiff reported to her doctors and her testimony at the hearing.

Because the ALJ did cite objective evidence which caused her to question the Plaintiff's statements about her symptoms, the Court is unable to conclude that the often criticized boilerplate language is alone sufficient to reverse the ALJ's decision.

(3)

The Plaintiff contends that the ALJ did not give proper weight to opinions concerning mental functioning. The ALJ found that Plaintiff suffered from depression. She further found the Plaintiff was limited to unskilled work and no more than occasional work interaction with coworkers, supervisors and the general public.

The Plaintiff criticizes the ALJ's brief discussion of mental impairment concerning Dr. Stelling's findings. The applicable portion of the Decision states:

At psychological consultative examination on March 12, 2010, the claimant was diagnosed with depressive disorder NOS and pain disorder associated with psychological factors. She was well groomed and appropriately dressed; she rode a bus to the appointment. She refused to perform serial sevens. She asserted that she was exhausted from pain and could barely get around. She stated that she had given up her job as a bus driver.

The decision does not discuss certain factors favorable to the Plaintiff's claim. Dr. Stelling observed deficits in immediate memory and in attention, short-term memory and concentration which he related to her depression. He found that she had a somatoform disorder. He assessed a GAF score of 50-51. Dr. Stelling found the Plaintiff to be "creditable and not malingering." His prognosis was as follows:

Considering that Ozie's pain disorder tends to enhance her depressive issues, that interaction suggests a guarded prognosis. Should a physical source of pain be identified, then the prognosis for depressive features, would be dependent on the medical status of the pain.

Because Dr. Stelling did not address specifically the Plaintiff's ability to perform work-related activities or identify any work-related limitations, the Government contends that the ALJ did not err in declining to give weight to his "non-existent" opinion.

A low GAF score alone is not enough to overturn an ALJ's finding of no disability. See Denton v. Astrue, 596 F.3d 419, 425 (7th Cir. 2010). A GAF score is a "snapshot of a particular moment." See Sambrooks v. Colvin, 566 F. App'x 506, 510 (7th Cir. 2014). The American Psychiatric Association no longer uses this metric. See Am. Psychiatric Ass'n Diagnostic and Statistical Manual of Mental Disorders 32 (4th ed. Text revision 2000). At the time of the Plaintiff's evaluations, however, GAF scores were still used to report a clinician's judgment of an "individual's overall level of functioning." See Am. Psychiatric Ass'n Diagnostic & Statistical Manual of Mental Disorders 32 (4th ed. text revision 2000).

Although an ALJ need not give any weight to individual GAF scores, the ALJ cannot simply cherry-pick certain medical evidence in support of the decision while ignoring or discounting evidence favorable to the claimant. See Yurt v. Colvin, 758 F.3d 850, 859-60 (7th Cir. 2014). In concluding that a recent decision was not supported by "substantial evidence," the Seventh Circuit found it significant that the ALJ did not mention any of the claimant's GAF scores which were between 40 and 50

and the court further observed it was not uncommon for ALJ's to ignore evidence in support of the claim.  See Czarnecki v. Colvin, __ F. App'x __, 2015 WL 55438 (7th Cir. Jan. 5, 2015).

In this case, the ALJ did not specifically mention the Plaintiff's GAF scores of 50-51 in January of 2010 or 47 in June of 2011.  The ALJ's discussion of GAF scores was mostly general, as follows:

> Furthermore, the low GAF's attributed to the claimant are not consistent with the objective record.  The undersigned notes that the GAF score is of limited value.  It is a subjective assessment of the claimant's current level of functioning utilizing a generic scale.  Because it is an assessment of the claimant's functioning at a specific point in time and is highly dependent on the claimant's current situation, it provides no indication of the claimant's overall level of functioning over an extended period.  Also, because a GAF score is part of a mental health assessment, it is often determined during periods when the individual is having significant problems mentally, financially, socially, etc.  Furthermore, because it is a subjective assessment and there are limited guidelines on how to assign a GAF score, if two people were to assess the claimant at the same time, it is highly likely that two different GAF scores would be assigned.  The Social Security Act requires the claimant to demonstrate a medically determinable "severe" impairment or impairments that precludes engaging in substantial gainful activity for a period of at least twelve months (or leads to death).  Therefore, when determining functioning, the undersigned must take a long-term approach.  Everyone will experience difficult times in their lives and go through periods

where their overall level of functioning is diminished. Individuals with severe physical and/or mental impairments are likely to have increased periods of diminished functioning and may be more likely to experience greater decreases in functional ability. However, it is still necessary to assess their level of functioning over a year or more. Because a GAF score only reflects a specific moment in time and can change rather dramatically in a short period of time as the claimant's circumstances change, it is of very little value in determining disability.

Only the first sentence relates specifically to the Plaintiff, stating in a conclusory fashion that her low GAF scores are not consistent with the objective evidence. The ALJ does not mention what those low GAF scores are or specify the objective evidence to which she refers. Moreover, the low scores are consistent with portions of the objective record. The rest of the ALJ's discussion of GAF scores are generic statements that could apply in virtually any case where a claimant's mental health is an issue.

Some of the ALJ's reasons for finding the GAF score of "limited value" are not applicable in this case. The Plaintiff had comparably low GAF scores approximately seventeen months apart. Thus, the Plaintiff's functioning was assessed over the course of more than a year. Accordingly, her scores do provide at least some indication as to her functioning over an

extended period and are not based on a specific point or short period of time, as the ALJ suggests.

Between January of 2010 and June of 2011, there were other medical findings which appear to be consistent with a serious impairment in functioning. In September of 2010, Dr. Johnson noted the Plaintiff was so emotionally fragile that she would not be able to endure obesity surgery. In May of 2011, Dr. Johnson observed the Plaintiff needed psychiatric intervention and a neurological referral. Dr. Johnson found her to be "mentally unstable" and in need of psychiatric care. The ALJ does not address these findings.

In addition to not specifically addressing Dr. Stelling's assessed GAF score of 50-51, the ALJ did not mention his finding that there was a relationship between the Plaintiff's pain and depression. Additionally, the ALJ did not mention Dr. Stelling's opinion that Plaintiff was not malingering.

The ALJ also did not discuss the opinion of Dr. Taylor. Although Dr. Taylor's belief that Plaintiff's depression "would not preclude the capacity

to engage in work related activity" was consistent with the ALJ's determination as to residual functional capacity, the ALJ did not mention Dr. Taylor's finding that she might have Affective Disorder and exhibited signs of sleep disturbance, decreased energy and difficulty concentrating and thinking or his opinion that Plaintiff had moderate limitations on her daily activities, social functioning and concentration. The ALJ did not consider how these findings might affect the Plaintiff's residual functional capacity.

Because the ALJ ignored or discounted some of the mental health evidence which was favorable to the Plaintiff's claim, the Court concludes that the decision is not supported by substantial evidence. See Yurt, 758 F.3d at 860 (discussing the tendency in disability cases of ignoring evidence in favor of the claim). Having made this determination, the Court need not discuss the Plaintiff's other arguments.

Ergo, the Plaintiff's Motion for Summary Judgment [d/e 9] is ALLOWED, to the extent that the Commissioner's Decision is Reversed and the action is Remanded.

The Defendant's Motion for Summary Affirmance [d/e 11] is DENIED.

Pursuant to the fourth sentence of 42 U.S.C. § 405(g), the Clerk shall enter a Judgment. This case is remanded to the Commissioner of Social Security for further proceedings consistent with this Opinion.

ENTER: January 23, 2015

FOR THE COURT:

  s/Richard Mills
Richard Mills
United States District Judge